HILLIARD (UNITED STATES v.). See Cases Nos. 15,367 and 15,368.

---

## Case No. 6,507.

### HILLS v. ALDEN et al.

[2 Hask. 299.][1]

District Court, D. Maine. Dec., 1878.

BANKRUPTCY — FRAUDULENT SALE BY ASSIGNEE — POWER OF REGISTER—ACQUIESCENCE OF CREDITORS.

1. A register in bankruptcy had authority, under the bankrupt act of 1867 [14 Stat. 517], as amended by the act of 1874 [18 Stat. 178], to designate the newspaper that should contain notices of sales, by the assignee, of the unencumbered real estate of the bankrupt.

2. The designation by a register, pursuant to rule of court of certain newspapers, approved by the court, wherein all notices required under the bankrupt law should be published, is a

---

[1] [Reported by Hon. John McLean, Circuit Justice.]

[1] [Reported by Thomas Hawes Haskell, Esq., and here reprinted by permission.]

designation of such newspapers by the district judge for each particular notice therein published.

3. Whether real estate under lease is unencumbered, quaere.

4. A mistake in judgment by the assignee, as to where a bankrupt sale should take place, or what special notices of it should be given in order that the largest sum may be realized, will not invalidate the sale, in the absence of fraud or collusion.

5. A sale by an assignee in bankruptcy, held at a place not the most desirable, and upon notice not the most advantageous, is not conclusive evidence of either fraud or collusion.

6. An assignee in bankruptcy takes only the title of the bankrupt, and can convey no more.

7. An assignee is not required to adjourn a bankrupt sale, to give a bidder, who does not offer to stand by his bid at the adjourned sale, time to search a title.

8. Creditors of a bankrupt, having seasonable and complete notice of an intended sale of the bankrupt's property by the assignee, who fail to exercise proper diligence to protect their own interests, must bear the loss occasioned by their neglect.

9. A creditor of a bankrupt, having full knowledge of the circumstances of a sale of the bankrupt's estate by the assignee, who silently allows the purchaser to dispose of the same, and knowingly receives, without objection, a dividend from the proceeds of such sale, cannot avoid the same for fraud and collusion.

In equity. Bill by [Joel H. Hills] the creditor of a bankrupt to set aside the assignee's sale of the bankrupt's estate for fraud and collusion between the assignee and purchaser; and because the notice of sale was insufficient under the act of 1874, c. 390, § 4 [18 Stat. 178]. [The court had previously refused to confirm said sale. Case No. 151]. The answer denied the fraud and collusion, and averred that the notice of sale was given in compliance with the act of 1874. The cause was heard upon bill, answer and proof.

Charles P. Mattocks, for orator.

George F. Holmes and Almon A. Strout, for respondents.

FOX, District Judge. The complainant, one of the creditors of Hiram O. Alden, the bankrupt, has brought this bill to set aside a sale of certain real estate, made by Hubbard, the assignee in bankruptcy, to Edward Alden, the son of bankrupt, upon the ground that the sale was not legally ordered or advertised, or fairly conducted; but that the same was collusive and fraudulent; that the assignee was deceived by the Aldens as to the value of the property, and that it was sold for much less than its real value.

This real estate is situated in the state of Illinois, and was sold by auction at Belfast, in the county of Waldo, in this state, where the bankrupt resided, to Edward Alden, for the sum of $1,240.

Was this sale made in accordance with the provisions of the bankrupt act? It appears that on the twenty-fourth day of March, 1877, the assignee in bankruptcy presented his petition, addressed to this court, to Mr. Register Hamlin, the register in charge of the bankrupt proceedings instituted by said Hiram O. Alden, therein praying for leave to sell, among other property, said real estate of the bankrupt, situated in said state of Illinois; and that, thereupon, on said twenty-fourth day of March, the said register granted to said assignee leave to sell said real estate; and by license under the seal of this court, attested by the clerk, it was ordered that said property should be sold at public auction; that notice of the sale should be advertised three successive weeks in the Republican Journal, a newspaper printed at Belfast in this district; and that a copy of the advertisement should be mailed to each creditor named on the schedules of said bankrupt postpaid, at least ten days before the sale.

Notice of said sale was given in accordance with the requirements of the license; and at the time and place appointed, the said real estate, having been advertised in parcels, was all purchased by said Edward Alden, he being the highest bidder therefor, the aggregate of his purchases being the sum of $1,240, as before stated.

The objection taken to these proceedings is, that the requirements of the act of June 22, 1874 (chapter 390, § 4), were not observed.

By this amendment of the bankrupt law, it was provided "that unless otherwise ordered by the court, the assignee shall sell the property of the bankrupt, whether real or personal, at public auction, in such parts or parcels, and at such times and places, as shall be best calculated to produce the greatest amount with the least expense. All notices of public sales under this act, by any assignee or officer of the court, shall be published once a week for three consecutive weeks in the newspaper or newspapers to be designated by the judge, which, in his opinion, shall be best calculated to give general notice of the sale."

At the October term, 1874, of the supreme court of the United States, the general rules and orders were amended; and by order No. V, the registers in bankruptcy were empowered to conduct proceedings in relation to the following matters when uncontested— viz., * * * "giving requisite directions for notices, advertisements, and other ministerial proceedings. * * * and generally dispatching all administrative business of the court in matters of bankruptcy, and making all requisite uncontested orders and directions therein, which are not, by the acts of congress concerning bankruptcy, specifically required to be made, done or performed by the district court itself; all of which shall be subject to the control and review of said court."

The contention on the part of the complainant is, that the register had no authority under the law to designate the paper in which the notice of this sale should be advertised;

but, that it was an act, which could be performed only by the judge, and could not by him be entrusted to the register.

The practice in this court, during the entire existence of the bankrupt law, has been for the register to designate the paper in which advertisements should be made of sales of unencumbered real estate, such papers having been originally selected in each county by the register for this purpose with the approval of the court; and any construction of the law, by which such proceedings should be declared invalid, would be attended with the most disastrous results in disturbing numerous titles, which have always been heretofore considered valid and effectual.

In the opinion of the court, this objection can not be sustained, the bankrupt act having empowered registers in bankruptcy to sit in chambers and dispatch there such part of the administrative business of the court, and such uncontested matters as shall be defined in general rules and orders, or as the district judge shall in any particular matter direct; and the supreme court having, by its general rule and order No. V, empowered the register to give requisite directions for notices and advertisements, and to dispatch all administrative business of the court in matters of bankruptcy, and to make all requisite uncontested orders and directions therein, which are not by the acts of congress, concerning bankruptcy, specifically required to be made, done or performed by the district court itself, a register was authorized in this case to designate the paper for such advertisement.

An examination of the amendatory act of 1874 demonstrates that while there are many matters therein specified, which the court can alone act upon, in all such cases, the court being specifically mentioned, the selection of a newspaper is not one of them, as the language used in such case is, that "the judge shall designate the paper;" and this power thus conferred upon the judge, by force of general rule and order No. V, is alike conferred upon the register.

This precise question was presented to Mr. Justice Blatchford, in Re Burke [Case No. 2,157], in which he decided that the register may designate the newspapers in which notice of a sale by the assignees shall be published.

The opinion is brief, but, is so decisive of the question here presented, that it may well be here quoted at length. "General order No. V of the new general orders provides that the registers may make all requisite uncontested orders which are not by statute specially required to be made by the district court itself. Section 4, of the act of 1874, does not require newspapers to be designated by the court, but by the judge; while that same section does name the court as distinct from the judge in connection with the doing of certain things. Therefore, the register is, within section 4 of the act of 1874, the judge for designating newspapers.

If this construction of the amendatory act of 1874 is incorrect, and it should be held that the judge should himself designate the papers in which advertisements should be published for the sale of unencumbered real estate, under the long practice of this court, it may well be determined that this sale was duly advertised in a paper selected by the judge for this purpose.

Soon after the bankruptcy law went into operation, the registers were required by a rule of this court to select in each county some suitable newspaper for the publication of all advertisements required by the bankruptcy law; and, in compliance with this rule, the Republican Journal was selected for the advertisements required in the county of Waldo. The judge of this court was at the time advised of the paper so selected; and, with his sanction and approval, all notices in that county required by the bankruptcy law have been published in this paper. The court, therefore, had thus in fact designated this paper as the proper one for all such notices; and the advertisements as ordered by the register were made in accordance with the previous sanction and authority of the court.

It is said that about ten acres of one of the parcels so sold was under lease. The terms of said lease do not appear; and no objection is made by the bill that thereby such parcel was encumbered property within the meaning of the bankrupt law. This objection, properly taken, would have been applicable to only one parcel of the premises in controversy. Whether a lease would constitute an encumbrance within the meaning of the bankrupt law, which would require notice to the lessee of any intended sale of the premises, need not now be determined, as the complainant does not seek to avoid the sale on account of such lease.

The requirements of the bankrupt law having been complied with, it remains to be determined whether this sale was so tainted by fraud or collusion, that it is the duty of the court, at the instance of this complainant, to vacate the same.

The first charge made in the bill is, that "the assignee acted in collusion with the bankrupt and his son Edward in order to prevent purchasers from bidding at the sale; and that he wrote one Cushman, at Boston, who was a creditor of the bankrupt, that the Illinois property was not of much value according to his information, thereby inducing Cushman to take no steps toward purchasing or securing a purchaser for said lands, as he would have done, if he had been correctly informed by the assignee."

The assignee admits the writing of this letter in reply to one received from Cushman; but, he avers that it is true that he was so informed. He denies all collusion with the other defendants, and insists that he acted

in good faith for the benefit of the creditors, in order to realize the most for the property.

It appears that the complainant received a copy of the advertisement of the assignee, and was fully informed of the time and place of the sale, as were also Cushman, and all the other creditors; and that at the sale, the complainant was represented by an agent, by whom his own note of $2,500 was purchased for Hills' benefit, for the sum of $50.

An examination of the testimony fails to satisfy the court that the assignee was guilty of any falsehood in his reply to Cushman's inquiry. He stated truly the information which he had received, both from the bankrupt and his attorney, as to the value of these lands; and Cushman made no further inquiry of him as to the source of such information, or what reliance should be given to it, nor did he ask the court for time to be allowed him to examine respecting the value of this property.

These lands were in the vicinity of the property of the Kankakee Company, a corporation organized for the improvement of the Kankakee river, and which for a time, under the management of Hiram O. Alden, had acquired some credit and property; but previous to his bankruptcy, it had become utterly insolvent, and its property, which was heavily mortgaged, was much depreciated in value. The complainant was the treasurer of this company; Cushman was one of its directors; and the court has no question that, at the time of the sale, both of them were well acquainted with the situation of Alden's lands in Illinois, and of their value.

Cushman, in his deposition, would give the court to understand that by this letter of the assignee, he was induced not to attend the auction sale; but as he admits that, after the reception of the letter and before the sale, he had made inquiries of other parties well acquainted with the property, the court entertains great doubts whether he was at all influenced by the assignee's response to his inquiries, but is the rather of opinion, from his own statement, that although he was informed by others that these lands were of value, he concluded that nothing would be realized from the estate, by this sale, beyond the expenses in bankruptcy, and therefore took no steps to prove his claim until he was subsequently informed that a dividend would be declared.

The present suit, however, is not instituted by Cushman, but is brought by Hills; and it is shown by his own testimony that previous to the sale he was possessed of all the information respecting these lands that he had when he commenced this action. He admits that, previous to the sale, he consulted with Waters, who was the engineer of the Kankakee Company, who had been long acquainted with these lands, and who then represented them to him as worth from 40 to 60 dollars per acre: that he also consulted with Carpenter, who had resided in Wilmington near these lands, and who also represented them as valuable. He further admits that he had reason to suspect that these lands would sell for but a small amount, but that, having no funds to invest, he and Carpenter informed Claflin in relation to the property, and that, at their instigation, Claflin sent an agent to Belfast to attend the sale. This agent was there present and purchased of Hills this note and for Claflin certain bonds and obligations of the Kankakee Company, together with a tax title and other property, and also made repeated bids for the property now in controversy, Edward Alden being his competitor.

Chaplin, the agent, in his deposition states that, during the pendency of the bids on the land, he asked the auctioneer to stop for a moment, and then stated publicly in a loud tone to the assignee, that he had bid as high, his bid then having run up to perhaps $1,000, as he should venture to bid without looking up the title, and that he asked if any assurance of title was given in the sale, or, whether there would be any opportunity to look up the title before paying. The assignee answered, that no assurance was given, and no time would be given. He then requested the assignee to postpone the sale to allow him time to look up the title before the sale should be completed, and stated that he was prepared to bid a very large amount, largely in excess of what he had bid, if he could assure himself that the title was good, and that he thought he stated, or implied at least, that the land was worth a great deal more than what the bid amounted to. The assignee said it was his duty to sell the right of the bankrupt, whatever it was, and that he could allow no time to look up the title. The witness also states that, a day or two before, he had endeavored by telegram to ascertain about the title from the registry of deeds, but could get no information on account of the imperfect description of the property.

The assignee's testimony on this point is that, "while one parcel of the Illinois land was on sale, and after it had been bid for by Chaplin and Edward Alden, Chaplin asked me if I would adjourn the sale to give him time to examine the title; I declined to delay the sale, because I thought I had no right to do so after the property had been offered and bid upon. I think there was not any request for time to examine titles after the property was sold and before payment."

The evidence of Chaplin demonstrates that the letter of the assignee to Cushman in no respect influenced the actions of this complainant, or of Claflin, but that, on the contrary, relying on the information derived from others, Claflin attempted to purchase these lands at the assignee's sale, and was only deterred in so doing by doubts suggested as to the validity of the title, his agent proclaiming publicly at the sale that if the title was valid, they were worth much beyond the amount then bid for them.

The bill claims that there was collusion between the assignee and the Aldens in fixing on the time and place of sale, and in giving the notice of the sale; and that if public notice had been given where the land was·situated, a much larger sum would have been realized. The evidence shows that the register, without any suggestion from any source, in the usual way determined the time and place of sale, and the newspaper, the one selected by the court, in which the advertisement of the sale should be published; and while the court is of opinion that, in the exercise of a sound judgment by the assignee, it would have proved much more advantageous to the creditors, if he had published notice of the sale in the Wilmington papers, yet, that it was but a matter of judgment on his part, and his omission so to·do is not sufficient to overcome the positive testimony of himself and Alden, that there was no collusion between them.

The averment in the bill is, that these lands were worth, at least, $40 an acre; and from the testimony in the case, the court is inclined to the opinion that if a sale of these lands had been publicly advertised at Wilmington, to take place upon the premises, they would have produced $25 or $30 per acre; yet this· is not an absolute certainty, as it was well known at that place that Alden was in bankruptcy, and that his estate must be disposed of by his assignee; but not one of the witnesses, who now testify that they would at public auction have given $40 per acre, took any steps to ascertain the intentions of the assignee, at what price he held this property, or how or when he intended to dispose of it.

The conduct of the assignee at the time of the sale, as testified to by Claflin, is also urged as evidence of fraud and collusion. An assignee in bankruptcy takes only the estate and interest of the bankrupt; all that he has to dispose of is the right, .title and interest of the bankrupt in his property at the time proceedings are instituted; and the assignee, therefore, never gives any assurance of title.

Claflin says his request to postpone the sale, to permit an opportunity to examine the title, was made when his bid was in the vicinity of $1,000. These lands were sold in separate parcels; and the court does not find that any ·one parcel sold for near that amount; but that the aggregate of the sale was $1,240. If Claflin is correct in his reference to the amount of his bids, his request for delay must have been made after the last parcel was offered, and bids received therefor, and after the sales of the other parcels had been completed, so that their validity could not be affected by any subsequent proceedings on his part.

In disposing of a bankrupt's property, his assignee is bound to exercise an honest, fair judgment, and if, previous to a sale, an intended purchaser should request of him that time be allowed to examine the title, and this should be denied, the court might deem this a suspicious circumstance, bearing upon the fairness of the assignee; but no such suspicion can well .arise after the property has been offered at auction, and numerous bids· made therefor, and when the party, desiring delay, does not propose to be absolutely bound by his bid ·at the adjournment of the sale, but simply requests delay to investigate the title, proposing to advance his bid if the title should prove valid, but not to be bound thereby if any defect should be discovered.

Under such circumstances, an assignee might well be justified in refusing to postpone the sale, as the result might be that, by reason of the investigation, the title might prove to be worthless, or so defective that at the adjournment a purchaser could· not be had· at any price. A party thus asking for time, should, at least, ·obligate himself to stand by his offer; and as nothing of that kind was proffered by Chaplin, the court fails to discern evidence of fraud or collusion on the part of the assignee in refusing the requested delay. If Claflin or his agent was not satisfied with the title, they could have made application to the court, previous to the sale, for its postponement; and the court would have granted or refused the application as it should deem most for the benefit of the estate.

The advertisement describes lots five and six as "containing about sixty-nine acres under lease." It is said that only ten acres were under lease, and thereby intended purchasers were deceived. The assignee testifies that this description was taken from the schedule of the bankrupt, which he believed to be correct. The duration of this lease does not distinctly appear from any of the testimony, but, from inquiries put to several of the witnesses, the court is led to believe · that the lease originally was given for three years, and, at the time of the sale, had nearly expired. The land was in pasture, and, from the testimony of the complainant's witnesses, the court infers that the value of the land was not affected by the existence of the lease, whatever it may have been.

In the present case, all the creditors were fully notified of the intended sale, a reasonable time before the day appointed, by a copy of the advertisement; by such notice, they were called upon to be vigilant, and were put upon due investigation and were required to take proper steps for further notice or examination as to the title or value of the property, if their interests were in any danger from the course adopted by the assignee. If, through their negligence, they have permitted the property to be sold for less than its fair value, and thereby have received a smaller dividend, they must bear the consequences; and especially should this complainant, as he admits that, previous to the sale, he possessed all the information as to the property which he now has. and that, after being informed of the conduct of the assignee, which he would now insist was.

fraudulent and dishonest, he in silence allowed the purchaser to dispose of portions of the property, and received over $700 in dividends from the estate, a part of which was derived from the funds received from these sales, which he would now invalidate.

Bill dismissed.